08 cv 224 ruling · pdf

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| SHEFFIELD LABORATORIES, | : | |
| Plaintiff | : | |
| | : | CASE NO. 3:08 CV 00224 DJS |
| V. | : | |
| | : | |
| THE HARTZ MOUNTAIN | : | |
| CORPORATION, | : | |
| Defendant | : | |
| | : | |

## RULING ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Sheffield Laboratories ("Sheffield"), brings this diversity action[1]

against the Defendant, Hartz Mountain Corporation ("Hartz"), raising claims of breach of

contract, promissory estoppel, and violation of the Connecticut Uniform Trade Secrets

Act (CUTSA) for work expended on the development of a cat hairball remedy formula.

Additionally, Sheffield seeks a declaratory judgment as to formula ownership.

Now pending before the court is the Defendant Hartz's summary judgment

motion on all counts. For the reasons set forth below, the motion for summary judgment

(**dkt. # 52**) is **DENIED**.

## FACTS

Sheffield is a New London, CT company in the business of developing and

manufacturing over-the-counter pharmaceutical products. Sheffield specializes in

producing toothpaste and creams. It does so through its own brand as well as for private

labels and contract packaging (also known as generic or store brands).

---

[1] The complaint seeks to establish federal jurisdiction based on diversity of citizenship but, in error, cites 28
U.S.C. § 1331, which grants federal jurisdiction based on a federal question. Actual diversity jurisdiction is
based on 28 U.S.C. § 1332.

Hartz is a New Jersey company in the business of manufacturing and selling pet care products. Hartz manufactures many of its own products, but also outsources the manufacture of some of its products.

In April of 2001, Hartz and Sheffield began discussions about the possibility of establishing a pet toothpaste supply relationship.[2] In 2004, the two companies reached an agreement that Hartz would outsource the manufacture of its pet toothpaste to Sheffield. At the time, Hartz outsourced the manufacture of its toothpaste product to another company and did not possess the formula to manufacture the toothpaste. This required Sheffield to reverse engineer and develop the toothpaste formula for Hartz. Once Sheffield reverse engineered the formula it began producing pet toothpaste for Hartz pursuant to purchase orders in August 2004. Actual production of the toothpaste required a purchase order from Hartz. These purchase orders provided assurances to both parties as to the amount of toothpaste to be produced and purchased. Without the purchase orders no toothpaste would be provided by Sheffield nor accepted by Hartz.

At this point, no formal document existed between the two companies regarding the pet toothpaste supply relationship except for the purchase orders. In 2006, two years after the formal initiation of the toothpaste production relationship, Sheffield attempted to establish a product specification sheet to govern the pet toothpaste supply relationship. This document outlines the product produced to ensure clear expectations of quality and actual agreement on the product being produced. Sheffield formally executed the document by signing it in early 2007. Hartz did not formally execute the document. Its outsourcing manager, Matthew Buckley ("Buckley"), signed only his first name and

---

[2] The companies dispute who initiated the toothpaste supply relationship. That factual dispute is not material for purposes of determining this motion.

2

failed to date the product specification document.  Other than the purchase orders, this was the sole written document exchanged between the two companies concerning the pet toothpaste supply relationship.

In early 2005, John Leone, a Sheffield sales representative, and Buckley began discussing the outsourcing to Sheffield of another Hartz product, a cat hairball remedy. Hartz had been manufacturing this hairball remedy in two flavors, malt and salmon, at its Bloomfield, New Jersey manufacturing facility for at least twelve years.  Hartz alleges the manufacture of the hairball remedy had been conducted with no problems and that cost reduction was its only motivation for seeking to outsource the manufacturing. Sheffield alleges that Hartz had several motivations in addition to cost reduction.  These alleged motivations include a consistency problem Hartz allegedly encountered with its formula as well as concerns that the Federal Food and Drug Administration ("FDA") would begin to regulate the production of the formula (the Sheffield manufacturing plant is an FDA approved facility).  The FDA regulation issue was confirmed by Buckley and Robert Falcone, a chemist at Hartz, in their deposition testimonies.  Hartz's motivation for entering into these discussions with Sheffield is not material for purposes of determining this motion.

Hartz communicated its desire to move its entire production of hairball remedy from its New Jersey facility to Sheffield.  While no production minimums were committed to, Hartz provided Sheffield with production projections based on its own hairball remedy production levels.  In August 2005, seeking to solidify this new production relationship, Hartz issued a purchase order to Sheffield for the production of 300,000 units of the Hartz salmon-flavored hairball remedy.  Hartz subsequently issued a

3

second purchase order in September 2005 for 75,000 units of the Hartz malt-flavored hairball remedy and 25,000 units of the Hartz salmon-flavored hairball remedy. In order for Sheffield to manufacture the hairball remedy, Hartz provided Sheffield with the Hartz hairball remedy formula. At this point, no documents had been executed between the parties regarding the hairball supply relationship except for the purchase orders. Sheffield attempted to replicate the Hartz formula at the Sheffield manufacturing facility, but was unable to do so. Sheffield encountered a "separation" problem, in that the product separated into its components. Unable to replicate the formula, Sheffield asked Hartz to cancel the outstanding purchase orders which Hartz agreed to do.

Sheffield alleges that a mutual decision was made between the two companies for Sheffield to attempt to develop a Hartz comparable formula. Hartz alleges that Sheffield is the one that sought Hartz's permission to develop a modified hairball remedy formula. Regardless, the two companies agreed that Sheffield would attempt to develop a hairball remedy formula.[3] Research and development of a formula began in September or October of 2005.

On January 19, 2006, about five months after Hartz had provided Sheffield with its proprietary formula, the parties entered into a Mutual Confidentiality Agreement ("Agreement"). The Agreement, a Hartz form agreement to which Sheffield requested limited changes, governed proprietary information. The Agreement provides in paragraph five as follows:

---

[3] Ownership of this formula is one of the issues in this lawsuit. For simplicity and clarity the court will refer to the formula as the "developed formula." This reference is not meant to indicate a determination of actual ownership by either party but simply to provide consistency throughout the opinion.

4

No license or conveyance of any rights under any discoveries, inventions, patents, trade secrets, proprietary Confidential Information, copyrights, trade names or trademarks, or applications therefore, or any other form of intellectual property is granted or implied with respect to any Confidential Information disclosed pursuant to the terms of this Agreement. Any ideas, inventions or improvements to existing products created in connection with such discussions shall be the sole and exclusive property of HARTZ.

Sheffield continued to work on development of a formula throughout 2006 and into 2007. Between the fall of 2005 and the summer of 2007, Hartz and Sheffield exchanged correspondence and held meetings concerning the development of a satisfactory hairball remedy formula. As a first step, in October 2005 Sheffield sent Hartz samples of a hairball remedy formula that Sheffield produced for another company. Sheffield hoped that this other formula could substitute for the Hartz formula. Hartz did not agree with this idea and in November 2005 Hartz employees visited the Sheffield facilities to discuss the development of the formula with a timeline for its development. In December 2005 and continuously throughout the development process Sheffield sent samples of different formulations to Hartz. These formulations required numerous tests by both companies to determine their suitability in terms of physical and microbiological integrity, shelf life and other factors necessary for product development.

Throughout the formula development process there were communications between Buckley of Hartz and Sheffield representatives about the pricing structure for the formula development work. In January of 2006, Sheffield provided a communication to Buckley stating that it would develop the formula at no charge if Sheffield would manufacture the developed formula for Hartz for a period of three years, at which point ownership of the developed formula would pass to Hartz. Sheffield also provided a pricing structure for Hartz's ownership of the formula should the supply relationship

5

terminate prior to the end of the three year period. Termination prior to one year would
result in a $15,000 fee, termination after one year but prior to two years would result in a
$10,000 fee, and termination after two years but prior to three years would result in a
$5,000 fee.[4] This communication was confirmed and reiterated by Buckley through an
email, a few days later, to a Sheffield representative. In this email, Buckley
acknowledged that the formula ownership would not pass to Hartz until the conclusion of
the three year supply relationship or the payment of the above mentioned fees, however,
no official ownership agreement was ever signed.

In September 2006, discussions between the two companies progressed to include
full scale batches of formula in preparation for full production by Sheffield of the hairball
remedies. At some point in late 2006 or early 2007, Hartz began asking for a "master
supply agreement." Hartz sought this written agreement about a year and a half to two
years into the formula development relationship. Hartz asked for several documents to be
included in this agreement but did not want any of those documents signed until it had
finalized exactly what the agreement would encompass. Sheffield sought certain written
agreements such as the formula ownership agreement that had been addressed in the
January 2006 communication to Buckley. At that time, Hartz was unwilling to sign the
agreement proposed by Sheffield and specifically requested that Sheffield wait until the
entire master supply agreement had been prepared. As late as March 21, 2007, the parties
continued to discuss issues such as art work necessary to began production. Sheffield's
work on formula development continued until August 2007, at which point Buckley
abruptly indicated that the project was on hold. Correspondence between the two
companies similarly continued until July 2007, at which point Sheffield representatives

---

[4] The court will refer to this as the "supply relationship proposal."

6

began having difficulties reaching Buckley until he ultimately informed Sheffield on or about August 13, 2007 that the project was on hold.

An internal Hartz email sent by Buckley, dated August 6, 2007, discussed Hartz's understanding that to secure ownership of the new hairball remedy formula Hartz had to pay Sheffield a $15,000 development fee. An internal Hartz document, dated May 31, 2007, indicates Sheffield would have ownership of the formula for a period of two years after which ownership would transfer to Hartz. This document also questions why Hartz didn't own the formula and whether anyone within Hartz knew what the Sheffield formula was.

The parties acknowledge three major differences between the Hartz original formula and the developed formula. First, Sheffield substituted the natural salmon flavoring used by Hartz with artificial salmon flavoring. It appears that a major reason for this change is the fact that natural salmon is an allergen. Its use in the Sheffield facility could contaminate other products as well as compromise the facility's FDA approval. Second, Sheffield made changes to the process used to produce the formula. Hartz used a high heat process that Sheffield considered cumbersome and unnecessary for the desired results. Sheffield replaced this process through the use of a preservative. Finally, Sheffield made changes to the percentage of the ingredients used for the formula. Hartz maintains that these changes are simply modifications and/or improvements to its original formula. Sheffield, on the other hand, argues it created an entirely new formula it characterizes as having "differences within the functionality of the formulation" and being more stable in terms of not separating into its components and no longer having microbiological growth issues.

## STANDARD

A motion for summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *American International Group, Inc. v. London American International Corp.,* 664 F.2d 348, 351 (2d Cir. 1981) (quoting *Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Central School District,* 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F. 2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## DISCUSSION

Sheffield maintains that: (1) Hartz has breached its implied contract to enter into a minimum three year supply agreement or pay \$15,000 per formula for the two hairball

8

remedies (malt and salmon flavored) developed by Sheffield; (2) it is entitled to payment for the research and development work it performed for Hartz pursuant to the doctrine of promissory estoppel; (3) Hartz violated CUTSA based on its alleged threatened use of the formula; and (4) it is entitled to a declaratory judgment that it is the rightful owner of the developed formula.

Hartz has moved for summary judgment on all counts on the grounds that: (1) the parties expected a written agreement that was never negotiated or signed and, thus, there is no basis in law for a breach of implied contract or promissory estoppel; (2) the contract claim is barred by the statute of frauds; (3) the CUTSA claim is barred because there is no evidence that Hartz has the formula and is using or has threatened to use it; and (4) Hartz is the rightful owner of the formula under the plain language of the Mutual Confidentiality Agreement.

**Choice of Law**

Federal jurisdiction in this case is based on diversity of citizenship between the parties. A federal court sitting in diversity applies the law of the forum state. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). This rule applies as well to the laws and rules governing the choice of law to apply when that choice is uncertain. *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 497 (1941). Both parties invoke Connecticut law to support their positions and, thus, accept the application of the law of the forum state. Under Connecticut law, the substantive law of the place of operative effect or performance of a contract controls. *Whitfield v. Empire Mutual Ins. Co.*, 167 Conn. 499, 506 (1975). Sheffield's Connecticut location means that a contract between

9

.
.

the parties, as alleged in the Amended Complaint, would have its operative effect or

performance occur in the forum state. The court concludes that Connecticut law applies.

## Breach of Implied Contract

Sheffield alleges Hartz violated an implied contract to produce the developed

hairball remedy with Sheffield for a period of three years or pay Sheffield a descending

fee schedule of up to $15,000 per formula if no production relationship occurred. Hartz

claims that "there is no basis as a matter of law for the breach of [implied] contract,"

contending that "the parties expect[ed] a written agreement, which was never negotiated

or signed." [5]

Hartz argues that the parties expected that there would be a written agreement to

govern the entire hairball remedy supply relationship, an agreement it terms the "master

supply agreement," in support of its contention that no implied contract could have

existed.  While a written agreement had not yet been executed between the parties,

Sheffield has provided sufficient evidence for a fact-finder to determine that a written

"master supply agreement" was not necessary to give rise to a contract between the

parties.  Sheffield points out that the parties had a prior pet toothpaste supply relationship

that "never involved any documents of a contractual nature other than the purchase orders

issued by Hartz." Substantial work on the hairball remedy formula had begun with the

full knowledge and consent of Hartz before any discussion of written documents had

occurred.  This includes the first purchase orders and Hartz sharing its proprietary

---

[5] Plaintiff's complaint stated a claim for breach of express contract.  In its memorandum in opposition of
Defendant's motion for summary judgment, however, it modified its claim to an implied contract claim.
The Defendant accepted this shift in its reply memorandum in further support of its motion for summary
judgment. "Whether [a] contract is styled express or implied involves no difference in legal effect, but lies
merely in the mode of manifesting assent." *Janusauskas v. Fichman*, 264 Conn. 796, 804 (2003) (internal
quotation marks omitted).

formula before any confidentiality agreement was discussed, as well as Sheffield's formula development work.

"An implied contract 'depends on actual agreement, and the party charged must have agreed, either by words or action or conduct, to undertake a contractual commitment to the party seeking to enforce such a commitment.' Like an express contract, an implied contract 'requires a meeting of the minds between the parties.'" *Plainville Electrical Products Co., Inc. v. Bechtel Bettis, Inc.*, No. 3:06cv920 (SRU), 2009 U.S. Dist. Lexis 24525, at * 35-36 (D. Conn. March 26, 2009) (quoting *Rosario v. J.C. Penney*, 463 F. Supp. 2d 229, 231 (D. Conn. 2006)). "The test is whether the conduct and acts of the parties show an agreement." *Brighenti v. New Britain Shirt Corp.*, 167 Conn. 403, 406 (1974).

An agreement is enforceable if the parties have reached a mutual understanding that is definite and certain regarding the essential terms. *L&R Realty v. Connecticut National Bank*, 53 Conn. App. 524, 535 (1999). Whether a contract is definite enough to enforce is a question of fact. *Augeri v. C.F. Wooding Co.*, 173 Conn. 426, 430-31 (1977).

Sheffield has provided sufficient evidence for a reasonable fact-finder to determine that while the parties had not signed a formal written agreement, they had arrived at a meeting of the minds. As Sheffield points out, it is not seeking to enforce any particular purchase order or production quantity, but rather an implied contract that Sheffield would recoup its development costs through a supply relationship. There remains a question of fact as to whether the exchanged communications and writings encompassed the essential terms of an agreement whereby Harz undertook a contractual commitment to Sheffield. In other words, did Hartz commit to use Sheffield for the

11

production of the developed formula for a specified time period or in the alternative pay Sheffield a fee for its development work? Additionally, if Hartz did make such a commitment, were the essential terms of the agreement sufficiently definite and certain?

Although an implied contract depends on actual agreement, "it is not fatal to a finding of an implied contract that there were no express manifestations of mutual assent if the parties, by their conduct, recognized the existence of contractual obligations." *Janusauskas*, 264 Conn. at 805 (internal quotation marks omitted).    Hartz argues that Sheffield indicated it was not seeking payment for the development because it saw that cost as an investment in the relationship. Hartz, in essence, suggests that Sheffield spent almost two full years in development of a formula without any reasonable expectation of payment. A reasonable fact-finder could determine that this assertion by Hartz ignores communications by Sheffield that it expected the supply relationship to last at least three years or in the alternative that it would be paid the development fee, which is less than the actual development costs.

Hartz further asserts that even had the master supply agreement been executed, it would not have set forth any specific purchase commitments by Hartz. It argues that only the issuance of purchase orders would determine specific amounts of products to be produced.    While Hartz's assertion as to specific purchase amounts may be accurate, it does not address the fact that Sheffield is seeking compensation for an implied agreement that Sheffield would be the sole supplier of the hairball remedy for a three year period regardless of the amounts actually ordered or receive compensation for each year for which the relationship terminated prior to the conclusion of the third year.

12

Whether the parties intended the purchase proposal to constitute a contract or intended that there should be no contract until the execution of a formal written contract, in this case the "master supply agreement," is a question of fact. *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 749 (2d Cir. 1998) (citing *Atlantic Terra Cotta Co. v. Chesapeake Terra Cotta Co.*, 96 Conn. 88, 97 (1921). "[T]he trier of fact determines whether an agreement has been made and what the terms of the agreement are. Moreover, if the trier of fact can find a reasonable basis for implying a missing term… the absence of the term is not fatal to the contract. *Id.* (citing *Presidential Capital Corp. v. Reale*, 231 Conn. 500, 507-508 (1994). A reasonable fact-finder could determine that while purchase orders were necessary for specific amounts of production, the parties had come to a mutual understanding as to the supply relationship itself.

Hartz also contends that Mathew Buckley was not authorized to bind Hartz to a contract, arguing that any communications in which he may have confirmed the purchase proposal were not binding on Hartz. Buckley's authority to bind Hartz is governed by the common law of agency. *See Tomlinson v. Board of Education*, 226 Conn. 704, 734 (1993). The principal may be bound by the actions of its agent if third parties dealing with the agent reasonably believe the agent's actions are authorized. *Id.* "Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal." *Id.* (internal quotation marks and citations omitted). Whether Buckley possessed apparent authority is an issue of fact to be determined based on two criteria. " First, it must appear from the principal's conduct that the principal held

13

the agent out as possessing sufficient authority to embrace the act in question, or knowingly, permitted [the agent] to act as having such authority.   Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action."  *Id.* at 734-35 (internal quotation marks and citations omitted).

The Court concludes that Sheffield has produced sufficient evidence to support a determination by a reasonable fact-finder that Buckley possessed apparent authority to bind Hartz with respect to an agreement with Sheffield.  Buckley was the Hartz representative who dealt directly with Sheffield.  It was Buckley who established the previous toothpaste supply relationship between the parties.  In several internal communications at Hartz, Buckley communicated the terms of the supply relationship proposal.  There is no evidence before the Court that Hartz officials communicated to Sheffield that Buckley was not authorized to enter into such an agreement or that Hartz expressly reserved the right not to be bound until a master supply agreement had been executed.   Buckley's apparent authority to bind Hartz is a material issue of fact that is in dispute and must be resolved by the trier of fact.

Hartz further contends that Sheffield's implied contract claim is barred by the statute of frauds.  Specifically, Hartz relies on Conn. Gen.Stat. § 42a-2-201(1), which states:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

14

As Hartz points out, contracts for the sale of goods are governed by the Uniform Commercial Code ("U.C.C."), Conn. Gen. Stat. § 42a-2-201. However, the alleged contract between Hartz and Sheffield involves both goods (the hairball remedy) and services (formula development). In considering whether a contract that includes both goods and services is governed by the U.C.C., the court must determine "'whether the dominant factor or 'essence' of the transaction is the sale of the materials or the services.'" *Nora Beverages,* 164 F.3d at 747 (quoting *Incomm, Inc. v. Thermo-Spa, Inc.*, 41 Conn. Supp. 566, 570 (Conn. Super. Ct. 1991)).

The Court believes that the essence of the contract as alleged by Sheffield is the supply of services, i.e., development of a hairball remedy formula and agreement to produce that formula as the sole supplier of the remedy, as opposed to the sale of any particular quantity of the remedy. A determination that the essence of Sheffield's claim is the supply of services means that Conn. Gen. Stat. § 42a-2-201(1) is not applicable to the alleged contract. Even if the U.C.C. did apply to the alleged contract, however, Hartz would not be entitled to summary judgment on the basis of the statute of frauds.

A determination that the essence of Sheffield's claim is the supply of goods would raise additional questions of fact, since there are other U.C.C. provisions that would have to be considered for purposes of Hartz's statute of frauds argument. Under Conn. Gen. Stat. § 42a-2-201(3):

> A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable (a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller...has made either a substantial beginning of their manufacture or commitments for their procurement....

15

Conn. Gen. Stat. § 42a-2-201(3) provides an exception to the requirement under §

42a-2-201(1) that contracts for the sale of goods be in writing that applies to goods that

are "specially manufactured."   Courts generally apply a four part test in determining

whether the specially manufactured goods exception applies: "(1) the goods must be

specially made for the buyer; (2) the goods must be unsuitable for sale to others in the

ordinary course of the seller's business; (3) the seller must have substantially begun to

have manufactured the goods or to have a commitment for their procurement; and (4) the

manufacture or commitment must have been commenced under circumstances reasonably

indicating that the goods are for the buyer and prior to the seller's receipt of notification

of contractual repudiation." *Kalas v. Cook*, 70 Conn. App. 477, 484 (Conn. App. Ct.

2002) (quoting *Webcor Packaging Corp. v. Autozone, Inc.*, 158 F.3d 354, 356 (6th Cir.

1998)).

"The term 'specially manufactured'...refers to the nature of the particular goods

in question, and not to whether the goods were made in an unusual, as opposed to the

regular, business operation or manufacturing process of the seller." *Id.* (internal

quotation marks omitted).   Whether the nature of the hairball remedy would fall under

the specially manufactured exemption is inherently a question of fact. *See Impossible

Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1037

(5th Cir. Fla. 1982) (The materials before the court "more than amply raise a genuine

question of fact regarding whether the [goods at issue] were specially manufactured

within the meaning of [the U.C.C.]).[6]   The Court concludes, on the basis of the record

before it, that there are genuine issues of fact as to whether the goods at issue in this case,

---

[6] The pertinent provision in the Florida statute under consideration in *Wackenhut*, Fla. Stat. § 672.201 (3) (formerly § 672.2-201(3)), is virtually identical to the pertinent language in Conn. Gen. Stat. §42a-2-201(3)

16

i.e., the hairball remedy, could qualify as "specially manufactured" under Conn. Gen. Stat. § 42a-2-201(3) and thereby avoid the requirement of a "writing sufficient to indicate that a contract for sale has been made" imposed by Conn. Gen. Stat. § 42a-2-201(1). For this additional reason, summary judgment on the basis of the statute of frauds is not appropriate.

In light of the foregoing, Hartz's motion for summary judgment as to Sheffield's implied contract claim is denied.

**Promissory Estoppel**

Sheffield's promissory estoppel claim arises out of factual allegations that also pertain to its implied contract claim, namely that Hartz promised it would produce the developed hairball remedy with Sheffield for a period of three years or pay Sheffield $15,000 if production did not occur. Sheffield alleges that it relied on these promises and expended a considerable amount of time and resources for which it now seeks reimbursement.

To succeed under a promissory estoppel claim, Sheffield must demonstrate: (1) a clear and definite promise; (2) which Hartz should reasonably have expected to induce reliance; (3) which did induce reliance; and (4) enforcement of which is the only way to avoid injustice. *D'Ulisse-Cupo v. Board Of Directors of Notre Dame High School*, 202 Conn. 206, 213 (1987); *see also Stewart v. Cendant Mobility Services Corp.*, 267 Conn. 96, 104 (2003) ("A fundamental element of promissory estoppel…is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance.").

17

Hartz relies on the same defense for the promissory estoppel claim as that put forth in response to the implied contract claim, namely that both parties expected a written contract and since none was negotiated, Sheffield could not reasonably have relied on any representations on the part of Hartz. The Court notes, however, that "[a]lthough the promise must be clear and definite, it need not be the equivalent of an offer to enter into a contract because the prerequisite for ...application [of the doctrine of promissory estoppel] is a *promise* and not a bargain and *not* an *offer*." *Stewart*, 267 Conn. at 105 (emphasis in original) (internal quotation marks omitted). "Additionally, the promise must reflect a present intent to commit as distinguished from a mere statement of intent to contract in the future." *Id.* "[W]hether a representation rises to the level of a promise is generally a question of fact, to be determined in light of the circumstances under which the representation was made." *Id.* at 106.

The cases provided by Hartz to rebut the promissory estoppel claim involved situations in which the parties expressly reserved the right not to be bound by negotiations until a formal written contract had been negotiated. In *Dacourt Group, Inc. v. Babcock Industries, Inc.*, 747 F. Supp. 157 (D. Conn. 1990), the plaintiff, a prospective purchaser and lessor of commercial property owned by the defendant, argued that a "Revised Offer" it had made to the defendant, along with a letter from the defendant to the plaintiff, evidenced the existence of a binding agreement between the parties. The court rejected that contention, finding that "[i]t is clear from the documents and the affidavits that the Revised Offer reflected the status of negotiations as of that date, but that material terms remained open for negotiation. The Revised Offer expressly called for the preparation of formal contractual documentation, an escrow deposit and financial and

18

environmental covenants remained material open terms." *Id.* at 160; *see also Equal Employment Opportunity Commission v. Beauty Enterprises, Inc.*, No. 3:01CV378 (AHN), 2007 U.S. Dist. LEXIS 80590 at * 13 (D. Conn. Oct. 31, 2007) ("The plaintiffs [who sought to enforce an alleged oral settlement agreement] admit that they insisted from the outset of negotiations that the settlement agreement had to be entered with the court in the form of a Consent Decree instead of some other more informal format.").

Hartz has provided no documentation that reflects a similar express reservation not to be bound by its communications and negotiations with Sheffield. A reasonable fact-finder could determine that Hartz made a clear and definite promise (that it would produce the developed hairball remedy with Sheffield for a period of three years or pay Sheffield $15,000 if production did not occur) which Hartz should reasonably have expected to induce reliance, that Hartz's promise did induce reliance by Sheffield, and that enforcement of that promise is the only way to avoid injustice. Consequently, Hartz's motion for summary judgment as to Sheffield's promissory estoppel claim is denied.

## CUTSA

Hartz asserts that "the claims under the Connecticut Uniform Trade Secrets Act [("CUTSA")] and for a declaratory judgment for Hartz's alleged wrongful actual or threatened use of the... [developed formula] are barred" arguing "that there is no evidence that Hartz has... [the] formula and is using or threatening to use it." Specifically, Hartz argues that Sheffield has not sufficiently demonstrated that it "ever provided Hartz with...[ the developed formula]".

19

Sheffield responds that through communications between the parties during the two year development period sufficient information was provided to Hartz as to the ingredients and formulations to essentially provide Hartz with the developed formula. Sheffield specifically points to an email sent in 2007 which lists the ingredients and corresponding percentages. Additionally, Robert Falcone, a chemist at Hartz, indicated in his deposition testimony that Sheffield provided information to Hartz on an ongoing basis concerning the formula being developed by Sheffield.

CUTSA provides protection against the misappropriation of trade secrets, which includes "disclosure or use of a trade secret of another without express or implied consent...[under certain specified conditions]." Conn. Gen. Stat. §35-51(b). A claimant may seek injunctive relief for "[a]ctual *or threatened* misappropriation" of a trade secret. Conn. Gen. Stat. §35-52(a) (emphasis added). Sheffield has alleged that Hartz's general counsel stated that Hartz had the right to produce and distribute the Sheffield- developed formula without compensation to Sheffield. As permitted under §35-52(a), Sheffield sought a preliminary injunction against this alleged threatened use by Hartz. The parties subsequently stipulated that "[d]uring the pendency of this litigation, neither party shall produce, further develop, market or sell the hairball remedy formula that Sheffield claims it developed as a result of its work on behalf of Hartz...." (dkt. #22).

For a court considering a summary judgment motion, "[t]he ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from that evidence in favor of the nonmoving party, and the applicable burden of proof." *Turley v. Sauquoit Valley School District*, 307 F.Supp.2d 403, 406-07 (N.D.N.Y. 2003). While the evidentiary

20

support presented by Sheffield in response to Hartz's attack on the CUTSA claim may be a slim reed, the Court finds that it is more than a "mere existence of a scintilla of evidence," which would not be sufficient to defeat a motion for summary judgment. *Columbus McKinnon Corp. v. China Semiconductor Co.*, 867 F.Supp. 1173, 1175 (W.D.N.Y. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In reaching this conclusion, the Court recognizes that "[w]hen ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact." *Zipoli v. Caraballo*, 603 F.Supp.2d 399, 402 (D.Conn. 2009). The Court concludes that there are triable issues of fact concerning the claim by Sheffield that Hartz has threatened to use a trade secret of Sheffield's in violation of CUTSA. As a result, Hartz's motion for summary judgment as to the CUTSA claim is denied.

**Formula Ownership**

Hartz next claims that "[it] is the rightful owner of... [the developed formula] under the plain language of the parties' Mutual Confidentiality Agreement." Specifically, Hartz points to paragraph five of the Agreement, which states in pertinent part that "[a]ny ideas, inventions or improvements to existing products created in connection with such discussion shall be the sole and exclusive property of HARTZ." Hartz argues that Sheffield simply modified or improved the Hartz formula, that Sheffield did not create a new formula and, therefore, the formula is "the sole and exclusive property of Hartz."

Sheffield responds that over the course of the formula development relationship it sent Hartz numerous samples and successive formulations for testing by both companies. Sheffield argues that "if... [it] was not developing new formulae, but merely 'tweaking'

21

or even 'revising' Hartz's formulae, not so much testing and development work would have been necessary." Furthermore, Sheffield demonstrates that around the same time the parties signed the Mutual Confidentiality Agreement, Sheffield communicated with Hartz its supply relationship proposal. It points to an email communication with Buckley who confirmed the understanding that "after three years of Sheffield manufacturing the remedies the formula ownership would pass through to Hartz." Otherwise, for ownership of the formula to shift to Hartz it would have to pay a descending fee structure with the fee diminishing the longer Sheffield produced the formula for Hartz.

Hartz asks the Court to make a determination as a matter of law that the developed formula is simply an improvement or modification of the original Hartz formula. As evidenced by the parties' various claims this issue is clearly a disputed question of fact. The issue turns on whether Sheffield merely "tweaked" and "modified" the Hartz formula, as suggested by Hartz, or developed a new formulation, as suggested by Sheffield. The resolution of that issue lies squarely within the province of the jury. Consequently, Sheffield's motion for summary judgment as to the claim relating to formula ownership is denied.

## CONCLUSION

For the foregoing reasons, the defendant's Motion for Summary Judgment (**dkt. #**

**52**) is **DENIED**.

SO ORDERED this ___ day of March, 2010.

/s/ Dominic J. Squatrito, USDJ

DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE

23